Well, you may proceed. Well, good morning. I'm Alan. And I represent the plaintiff appellant and see Randall. This case has been extensively brief and therefore I'll be somewhat brief with my remarks today. The plaintiff essentially adopts Judge Weisslein's finding of fact in the application of law except for his application of per se with the legal conclusion that there is no case law. To put Officer Williams on notice, his actions were a violation of Mr. Dent's Fourth Amendment rights. Basically, as you know from the briefing, there was a chase. It was a two part police chase in which initially it started for about maybe half a mile or so and they cut it off. And then they picked up. They lost sight of Mr. Van and picked them back up a few moments later, a couple of miles away and lost them again. And then there was a period of time where they hadn't seen him and he had picked up Miss Randall and further down. Probably initially they were just chasing him. They're just getting him to stop a traffic violation. That's correct. This all started with a simple traffic violation, a misdemeanor traffic violation for reckless driving. So it became a felony, did it not? Yes, it became a felony evasion. 40 minutes. And he was doing a lot more than just running stop signs during the chase. Well, actually, as far as reckless driving goes, it's sort of a matter of opinions how reckless it was. Clearly, if it had been very reckless, they would have cut it off as they did the one time earlier when it got around people. Well, that was because the officers discontinued the chase because, in their opinion, it was too dangerous. So in their judgment, he was posing a pretty grave danger to the citizenry at large and to the officers who were chasing him. That's correct. Early on. But then when they picked it back up, it went on for about five miles. So he continued in that same felony behavior later on when the chase resumed. That's correct. But as far as an immediate threat to individuals, if you look at it in the context of the second chase was six miles long. And the only time it was that they broke off was when it went through a parking area. Right. But you're not arguing that the second part of the chase was any less dangerous than the first part of the case. Actually, I am. You are. Yes. Yes. I think factually you find that there was never any close calls reported in on the radio traffic. No. I mean, no citizens called in. Nobody got run off the road. Nobody. I thought there was testimony that he sites like the car just before he approached Officer Williamson's position. What he did was there were two lanes of traffic. The fast and slow lane. Officer Williamson had blocked off the intersection with civilian cars, brought his car in between. And Mr. Rent was a couple of cars back. And so he squeezed in between those two lanes going about one mile an hour. This is great. Excuse me. Where is that intersection on this map? Oh, not on my map. I see where it is. And secondly, he's coming. What does it mean to say that they were blocking the intersections with civilian cars? No, there are people in the cars. So he kept going. He could have ran to the car. No, he was there at the front of the cars. When say no, but if they were in front of him and he kept driving, he would have run into the car. What he got shot. He was in front of the front row. Oh, I see. He was already in front. Right. Exactly. What was the point of the blockade? It was behind him. When he started, he was two car lengths back. OK, when the cars got blocked, they were like two deep. And he came in between the two lanes and drove them like that. So he was already in front of them at that time. Right. So in front of him was empty space at that point? It was an intersection. With cars coming the other way. But the intersection was blocked off. So there was no traffic, cross traffic or anything like that. So at any rate, as you've seen in the briefing, the two questions are whether there's a or the real question comes down to whether there was an established right for Mr. or for Officer Williams to violate. And it's, you know, playing the position that, you know, if Judge Weisslein says, well, you know, whether he was moving or not moving, which is a big difference in facts. OK, I mean, he stopped. We would submit that you don't need any case law, as it was quoted in Brazil. They talk about Graham saying that, you know, it's obvious. And I think a stopped vehicle is obvious that you don't need to shoot a guy three times. Officer Williams testimony was, well, that obviously could have been stopped momentarily. But he had already wiggled between these two lines of traffic and he could continue to start up again and do it. But if he's holding his hand up to stop and the car gets right up, the policeman stops. There'd be no reasonable, reasonable police officer wouldn't then raise his hand. How do you how do you explain how you explain the testimony that the officer was lifted upwards by the force of the vehicle? Absolutely incredible testimony that the officer, the officer and the eyewitness were lying. No, the officer doesn't even say he was lifted up. He says he got up on his toes to shoot down because the plane had ducked behind the dashboard. When he pointed his gun at him and that the van made contact with his leg and with his chest. And the eyewitness who was sitting in the car saw the officer rise up at that point. The eyewitness also said in cross-examination that she did not see that car hit her. I asked her if she saw it hit his shins, his legs, his stomach, his chest. And she said, no, I didn't have a view. I didn't see it. All she saw was him lift up. At this point, the judge decided that there was at least some evidence to support the proposition that the car was stopped. Right. And that's not a reviewable question at this juncture, or is it? I guess it is. Well, I think it is, Your Honor, because if the car is stopped and you look at the facts and you like most. This is not a qualified immunity appeal as such. Well, he finds qualified immunity, but it's final judgment. I'm sorry. Ultimately, a final judgment. Yeah. So at any rate, there's a great dispute on how this case ended in the shooting occurred because Nancy Randall testified that the car was stopped. This woman who was behind and to the right admits that she didn't actually see the car hit the officer. The officer claims he hit his shins. And so he put his hand down and reached up and shot like this as the car pushed him back. Who would submit? That's ridiculous. I mean, this is not a credible statement. More likely than not, the Mr. Van's foot was on the brake stop. And when the officer reached up and shot him, that's when the car lurched. And even the officer admits it lurched after he shot. Well, it lurched because when he died, his foot came on the brake. And so he had plenty of time to get out of the way, even after firing three times. What was the what was the medical testimony with regard to the position that Mr. Van was in when the fatal shot was fired? The medical testimony as far as where he was shot. I mean, have you taken the deposition of the Alaska State Medical Examiner? And what does he say about the position of the body at the time the fatal shot was fired? Was Mr. Van crouching down beneath the beneath the dashboard? It's been about two or three years. My understanding was that he was shot through the chest. One time went through an arm and the other time, I believe, through the collarbone. I thought there was some evidence that he bent down. He did. Everybody says that he was bent down. The officer said the reason he did. What do you make of the bending down business? Officer stops a car. Let's go with your scenario. So the car comes to a stop. The medium comes to a stop. And then the guy, instead of getting out, crouches down. Well, the officer can't see his hands. He can't see whether he's reaching for a weapon or whether he is concealing something. But there's some degree of danger to officers and people standing around when the guy fails to, you know, once he comes to a stop, fails to cooperate, fails to show his hands, get out of the vehicle and submit to authority. That's it. That's a guy that could have a shotgun. There could have assault weapon. Could have anything. Oh, yes. Except for that. We have to go by what the officer's perception was at the time he shot. He makes no he's never made any statement claiming that he was afraid for fear. So his claim is he Officer Williamson's explanation is primarily that he thought he was in fatal danger. And to some degree that he thought that other people were in danger. Now, ultimately, we have to fly Tennessee versus Gardner. We have to figure out also how we're so sensitive. So he in this instance, he says, does he say both? It was his own thing. He's gone both ways. He's in deposition. He said that, you know, he was worried about or in fear of his life. And then upon further questioning by his counsel, he said, oh, and I'm also was afraid that the people. So in terms of fear of his life, what is your position with regard to the question of assuming that he actually thought the guy might have kept going and run him over? But he also said, I could just have moved away. Right. And he was clear about that, that he could have simply moved away. Is that enough to eliminate any danger to him from a constitutional point of view that as long as he could have just gotten out of the way because the car was going so slowly? And that's the end of his danger to himself. Is that your position or not? It actually is your honor. I believe that when you're trying to stop someone for a traffic violation, who's an unarmed person other than it was a felony. So it's more than a plain old. Right. But not that didn't involve any serious personal injury. And what is that required, though? I mean, is it isn't the whole purpose of recklessness to take people off the road before they kill other people? Because it is a foreseeable risk of that behavior that others could be killed by his reckless driving. That's correct. But under the specific facts of this case, it had not gotten that reckless. I was trying to avoid that question for the moment. Just ask about danger to him. Yes. As far as the danger to him, your honor, I believe that under the circumstances, the facts of this case are based on the gravity of the allegations against. You think the gravity of the allegations factor into the question of whether he was entitled to stand his ground or move aside? Exactly. OK, then let's go back to my question, which is given the 40 minute behavior prior to the shooting. Why wouldn't it be reasonable for a reasonable officer in this situation to take action in order to prevent harm to the public? Based on the behavior that Vint had exhibited in the preceding 40 minutes, because for one thing, our position is that he had stopped. And as far as your honor, this is his statement about being bent over as he comes to a stop is when he gets shot. So as far as him not cooperating or getting out of the car, he didn't even have a chance. Well, didn't the officer testify that he believed that if he was unable to prevent Mr. Vint from going through the intersection at East Cowles or Cowles Road, whatever it is, that that there was nothing standing in between Officer Williamson and the rest of the citizens of Fairbanks who would be in danger? Apparently that goes. Well, our position is that it goes to the gravity. How grave of a danger was he? Judge Biceline didn't find that there was any immediate danger to the public in his findings. What did the officer know and how much knowledge to attribute to him in terms of the scope of the chase? The suspect's background record and all that. How much of that does he know? How much of that knowledge? He knew absolutely nothing about the background of the crime. All he knew is that someone who they thought was Corwin Vint, who he doesn't know, had borrowed a van and was on his chase. Officer Williamson got involved for a very short distance from the College Road off ramp. I would just hazard to guess, probably about a mile and a half to get around and cross the bridge. So how much on this map? Well, his direct involvement, although I'm not saying that there wasn't some radio traffic. Well, we'll get to the radio traffic in a minute. Let's start with the map. Here. Oh, I see here he says he's the suspect's Williams. And that's not true. That's where he comes off College Road. This way. Well, that's where he's coming up. So he is following this through. OK, sure. He's following this through ramp to the river. So did Officer Williamson discontinue the chase or his participation in it at the Chena River Bridge? Then he proceeded to the intersection of Cowles and Airport Way, figuring that Vint would have to come back through that location. Presumably. And then he pulled his car over perpendicular to the traffic. Correct. And he had these other cars just tell him to stop. And that's the sense in which there was a civilian blockade. They just stopped traffic. And the effect of that was to funnel him into the one lane that Officer Williamson then placed himself in. Well, actually, I think he expected him to stop completely. And what Mr. Vint did was go in between the fast and slow lane. And to that extent, that's where Mr. Officer Williamson placed himself. And it wasn't a slowly, I mean, a quickly escalating event. He was going what was called a slow paced walk. And he goes, so he's coming from say where you are. He had slowed down from 30 miles an hour to a slow walk. And then just kept coming, kept coming. The officer walks up, goes like this, and the van gets to here. He says, of course, that he was pushed by his shins. I think it's clearly a jury question. But I guess what I was asking was, was the effect of the blockade to funnel him into the place at which Officer Williamson was standing? I don't believe so. I think he expected Mr. Vint to just stop behind the car in front of him. What if the officer's body had not been there? Well, Mr. Vint could have gone through that intersection. But I mean, realistically, as it turns out, he couldn't have because a car pulled up to block the only remaining space. But that's why I didn't know that. Officer Williamson, I believe, was testified in deposition. He didn't know that another car pulled up to block off. So he was using his body as a way of stopping the car. You know, I'm not him, but that's what it looks like. Now, you were answering my question about what officer knew and you were. Oh, he did know about the chase, about his background and everything else. The stuff came through on the radio, right? Did you want to tell us that? Yes, there was radio traffic. And what did, how much of that did he catch and what did it say? That I don't know. But he's never testified in deposition that, you know, what effect that's had on him. Well, did you get the tape of the radio traffic? Yes, and there's some cutouts. I mean, there's really, the two chases really only took a total of about 15, 20 minutes tops. Both chases were reported on the radio? Yes. Okay, so if he was listening to the radio, he could have heard that. Yeah, but there was some testimony in one of the depositions about the radio not working. But he did, as to whether he knew who Mr. Vendt was, he didn't, he said something to the effect of, well, somebody said on the radio that it was probably Corwin Vendt and I knew who that guy was essentially. No, he didn't know who he was. I thought he said he did know who he was. I thought he said he knew about him. He said, the question was, did you know it was Corwin Vendt? And he said, well, someone on the radio said that they contacted the owner and they thought Corwin Vendt was driving it. That didn't translate to him knowing who Corwin Vendt was, because further on in that deposition he states, I did not know who he was. And he also didn't know for sure who was in the car because he ducked down so he could never see his face. Because I said, well, don't you think, did you know it was Corwin Vendt when you shot him? And he said no. Could you briefly tell me, just on the narrow question of qualified immunity, why this, how we could hold that there was qualified immunity, not qualified immunity here given the Briseau v. Hagen case? Because I think the Briseau-Hagen case tells you, if you interpret it like Judge Bicelan interprets it, it's overbroad in the protection of the police officers such that if you don't have exactly the same fact pattern, which you heard about. Well, I'm not really talking about the generality question. I'm talking about specifically in that case where it seemed to me that the, I guess my question is how would you compare the danger to the officer and the danger to others in that case with this one? Well, I think in this case, if you look at the facts, in the light most favorable to the plaintiff appellant, non-moving party, the testimony is he stopped. So there's no danger. He's not fleeing anymore. I mean, what happened before isn't as relevant to the question of whether you should shoot as what's happening right now. At the moment you shoot your gun, what's going on? He stopped. Okay. Thank you. We'll hear from the closing counsel. May it please the court. My name is Joe Evans and I represent Officer Williamson. And if I may, following up on some of the questions about the chase and the information that Officer Williamson had. Officer Williamson positioned himself here based upon radio traffic that he had heard about the discovery of Corwin Bent up here in what was called the Aurora subdivision. He positioned himself right off of the Johansson Expressway in such a fashion that he thought he could block Mr. Bent when he came off of the Johansson Expressway. When he came off the Johansson Expressway, Mr. Bent pulled a maneuver that caused Officer Williamson to feel that Bent was going to collide with his vehicle. Officer Williamson pulled to the side, allowed Bent to get in front of him, and started pursuing Bent. He pursued Bent down College Road. College Road is a very heavily traveled area in Fairbanks where ultimately Bent cuts through the Fred Meyer parking lot at a speed of approximately 30 miles an hour on a Sunday afternoon, proceeds to run a red light and basically do a loop-de-loop maneuver down 3rd, then 49 Mile Road, and then back up onto Minnie Street. During this time, Officer Williamson is one of three vehicles that are pursuing Bent. After they get onto Illinois and come down Illinois and cross the Cushman Bridge, Officer Williamson at this point is not the lead vehicle riding back at Mr. Bent. Officer Williamson is two vehicles back. He is the third police vehicle back. As they go down 1st Avenue here, Officer Williamson at this point cuts down Cowles. The other officers pursue him on down later. And Officer Williamson, in response to your questions, if you look at Excerpt of Record 168, you'll see there what Officer Williamson set up in the intersection of Cowles and Airport Way on Sunday evening. Again, that's Excerpt of Record 168. And what he ended up with, the so-called civilian blockade, he ended up with civilian vehicles positioned in the left turn lane, the right turn lane, and the so-called fast and slow lanes. Officer Williamson, in his deposition, which is part of the record here, his assumption was that if he blockaded this intersection in that fashion, Mr. Bent, who was behind the blockade, would stop his vehicle, get out of his vehicle, and essentially try and exit the scene by running. Now, in terms of what the Tennessee versus Garner standard, and when they could have shot him, at any point during this trip, could they have simply shot him because he was driving recklessly? No. Even though he was endangering people as he was driving? I don't believe so, with the exception, when he came down, laid up straight and... No, I don't believe so. So, if that's the case, and I guess this was Officer Williamson's position, it really wasn't the danger to others that justified the shooting because if it were, then it would make a lot more sense to shoot him when he's actually driving fast and recklessly around town than when he stopped, or almost stopped. That was the concern. That was the concern, yes. So, the concern was essentially the danger to Officer Williamson himself. Well, but it was also, too, as he testified in his deposition, assuming that Mr. Venn had gotten through this intersection, and to do that, he would have had to run over Officer Williamson because Officer Williamson said in his deposition that, remember now, it's dark, and what he sees is he sees the pursuit coming at him, he's now stopped in this intersection, and approximately 100 to 150 yards down the road, he sees Venn, followed by the other officers, come down later and turn onto Airport Way. Now, what Officer Williamson said, and there's no dispute about this, he thought, as I said, that Venn was going to stop. So, what he started to do, there are the civilian vehicles, there are four vehicles that are facing him with their headlights on. What he did is he saw the pursuit coming towards him, he started to walk over and look down the space between the vehicles, and fortuitously, he looks down the first line, he looks down the second line, because what he's looking for is, his assumption is that Venn's going to get out of that van and run. But what he sees is, he sees a vehicle that comes and starts scraping the edges of the cars that are stopped. That's Venn's van. His mental process goes, that's got to be Venn. Because now, instead of stopping, I see this vehicle come between the two parked lines, as it shows on the figure here, 168. He is now standing in front of that gap between those two lines. He puts his hand up and motions for Venn to stop. And as Mr. McCurra said, Venn slows down. The reason Venn slows down is because now he's playing bumper cars with the two lines of cars that are stopped. As Venn approaches him, he sees, that is, Officer Williams sees, and the officers in back see from the lights that are shining to the back of the van. You should speak at the lectern, because this is being recorded, and your words are being lost for austerity. As he sees them coming towards him, he notices that Venn starts to duck down. And there's no dispute that that's what Venn did. In fact, the officers who are pursuing him from behind, unbeknownst to Officer Williamson, when Venn starts... Or after he pulled the gun. When he sees Venn start to... He has the gun pulled when Venn starts to duck down. The officers in back see the same thing. Unbeknownst to Williamson, the officers who have been pursuing Venn, when they see Venn start to come up this line of cars, two of the officers stop their vehicles, get out, and start pursuing Venn by foot. I don't think any of this is relevant to the question I asked. Well, the reason I think it's relevant is what Officer Williamson is dealing with here is a situation where he's pursued this man through parking lots, through residential areas. He's now positioned himself in front of him. And he says in his deposition, if I don't stop him, he's going to kill me and he's going to get beyond that there on one of the busiest roads in town and he's going to potentially harm others. With what? How is he going to kill him? With his vehicle. But that's why I asked the question I asked to begin with. Which is, unless you have some... He was driving recklessly all the way through. And you agree, and it seems to me you have to agree, that they couldn't simply shoot him at that point. So the question is, in terms of danger to others as opposed to Williamson, what changed at that point that allows Williamson to shoot him because he's afraid he's going to run others over when at that point he's not running... He's very slow. He's not driving recklessly. So when he was driving recklessly, you couldn't shoot him. But now that he's not driving recklessly, you can. Judge, I think when the van makes contact with Officer Williamson... I'm trying to separate that out. That's Williamson. I want to know about danger to others first. Other than Williamson. Well, according to what Officer Williamson said in his deposition, if Vint was willing to run him over, Officer Williamson... I see. So the notion is that now he's become more dangerous because he's willing to run Williamson over. If he's willing to run police officers over. There's a fashion dispute as to whether he was willing to run him over. There's at least one version of the fact that says that he stopped. But Judge, that version is the version that Nancy Randall came up with three years after when she was deposed. When she was initially interviewed... What does it matter? It matters because if she's saying I've had... And this is her deposition testimony. I've had three years to think about it, and I now say he stopped. What she actually said the first time was, first she said he stopped. And then they started talking and talking to her. And she says, well, I don't know for sure he stopped. I know he was meant to be stopping, and I thought he'd stopped. And she certainly didn't say he didn't stop. Her position was... Her position, Judge, was she wasn't sure. She said, I thought he stopped. I think he stopped. He meant to stop. So the jury could not, therefore, hearing that, say, conclude that he stopped? When she said, I thought he stopped, I think he stopped, I believe he stopped. It's possible. I'm not sure.  That's not testimony from which a jury can conclude that he stopped? I... Certainly. They could conclude based on that. They could disregard the other statements you made. So we've just wasted two minutes. I said there's a factual dispute on this point. You now agree? Yes, Your Honor. Okay, so let's get back to what I was asking. So there's a factual dispute as to whether he was stopped or moving. We have to then accept that he was stopped for purposes of a judgment. That's the way it works, right? There's a factual dispute. That's correct. We give it... We have to give it, yes. So there he is. He stopped. What danger is there to the officer? The danger to the officer? That justifies it. The guy has just, you know, rather than running over, which, you know, he could have done, rather than accelerating and, you know, sliding over the car, he stopped. What at that point... You know, if it wasn't justified to shoot him when he was driving recklessly, if it wasn't justified to shoot him as he was coming to a stop, how does it become... How does he get justification... Now that he stopped, he hasn't run over the officer, how does he get justification for shooting? Because the officer's... Officer Williamson's perspective, which I submit was objectively reasonable, was the reason that Dent stopped was because the van made contact with Officer Williamson. Officer Williamson, according to the witness right here... But still, he still wasn't running him over, because if he wanted to run him over, he wouldn't have stopped. He'd run him over. No, but he stopped, Your Honor, because Officer Williamson shot him. When he made contact with him moving at this walking pace... In other words, Officer Williamson's perception was he didn't stop. Yes, that's correct. So, ultimately, your position depends on the reasonableness of Officer Williamson believing he didn't stop when he did stop. And the testimony of the other civilian witness, who said that she thought she was going to see an officer run over and saw him... How does shooting the driver keep the vehicle from running over the officer? I mean, let's say there's a guy at the wheel. He's got his foot on the gas, right? Right. Or maybe his foot on the brake, for that matter. You shoot him. I mean, in order to stop a vehicle, you have to have an active, live person pumping the brake. You have to have some way of bringing that vehicle to a stop. And that driver, with an engine that's running with an automated transmission and drive, the effect of killing the driver is to make that vehicle continue. There's no way to kill him and make... I would disagree with you, Judge. And the reason I would is if that vehicle is running free and there are no cars on either side of it, you're correct. If I shoot the driver and his foot's on the brake or the gas, we don't know what the vehicle's going to do. But remember now, there's no dispute about this. The record shows that when he came up to the point where he made contact with Officer Williamson, he was literally forcing his way through other stopped vehicles. And both sides of his vehicle were making contact with other vehicles. So in order for him to continue, he had to have his foot on the brake. Foot on the gas. But I thought there was evidence that he sideswiped one vehicle. Actually, I believe the record will show that as he came through, he sideswiped... His vehicle was number two here. But he actually sideswiped six, seven, and Grundy's vehicle, which is eight. So there were three vehicles that he was working his way through. Here's another question that I have to do. So is your ultimate position, because this isn't really the way Williamson articulated it. Williamson seems to be articulating primarily a concern about his own danger. You're now saying that he thought because he was willing to run him over, he thought that wrongly, that the danger had escalated from what it was before. Yes. With regard to Williamson's own danger, it's undisputed, as I understand it, that Williamson could have avoided that by moving aside. That's true. He could have stepped to the side. And your position, as I understand it, is he's entitled to stand there anyway and shoot. He's entitled to stand his ground. He's not required to retreat. So, I mean, is that... Even in the case of Hennessey v. Garner, deadly force, where he... And there's also the fact that there was expert testimony in this case that that was a very stupid way to proceed. But maybe we can just stand there and say, I mean, as a live body, rather than moving aside and shoot the guy instead of getting out of the way. As a matter of... That's what you're saying. Yes. But you're saying that under Hennessey v. Garner, even though he can only shoot somebody if he's in danger, he can create the danger by standing there instead of moving aside and then shoot the guy dead. He didn't create the danger. Ben created the danger by not stopping him. Not just that, but this particular danger, the danger that he was going to get run over. Right. He could have easily avoided it by just moving. And allowed them to proceed until... But then you have to have the danger to others has to be real. And you have to deal with that. But in terms of the danger to him, he could have just eliminated it. By stepping aside, that's correct. So let's say he steps aside. And as Vint passes him, he points the gun at him and shoots him to the head. Okay? I think you better speak because the microphone doesn't register nods. Oh, yes. Are you asking can he shoot him as he passes through? Yes. In that situation? And why is that? We have now, by changing the situation, the hypothetical, the danger to him has been averted by the deft stepping out of the way of the officer. Right. Why is it that he can now, as the vehicle passes, can he shoot the driver? Because I believe two things. One, because of the danger that Vint poses should he proceed on through that intersection. What is that danger to whom? To anyone else up at the next intersection, the next controlled intersection. So anybody who is reckless driving, who is seen driving recklessly can be shot by the police? No. I'm sorry. What is it about him that made shooting him justifiable? In your scenario? Yes, my scenario. In your scenario, I would say that as he passed through that intersection, based upon what Officer Williamson had witnessed in chasing him to that point, that in Officer Williamson's mind it was objectively reasonable for him to stop Vint before Vint went to the next intersection and killed a civilian when he ran the light there. And this is a felony. But his position has to be, and that's why I started with this, and I was surprised by your position, that at some point of recklessness you can't just shoot the guy. No, I would agree. When I was listening to your question, Judge, my assumption was that you're pursuing him and you're having the officers pull up beside him and try and shoot him running through a residential neighborhood. No, I don't think that's reasonable to do because, frankly, at that particular point because the intersection was more crowded? No, I would submit that if you've got someone cordoned off like this with a roadblock, and he isn't going to stop for the roadblock, and he's going to proceed through the roadblock based upon what Officer Williamson had seen prior to the roadblock, that if he had stepped aside, and as you said, Judge, saw him pass on through, I don't believe that the case law says it would be objectively unreasonable for him. And so essentially it's because, you would say, because going through the roadblock demonstrated a degree of recklessness that was higher than what might have gone on before. Exactly. Because now he really wasn't going to stop, and he had a side spot. And this may be, but he had side spot cars to do it, and he had to at least appear to be willing to run over the driver even though the officer got out of the way. Yes. I think now we've taken it to another level. Yes. Okay. Thank you. You know, basically on this time, maybe you have anything to say about that, if you want to take it, yeah? Just in response to that last note, as far as the degree of recklessness rising at that intersection, I would say that actually that's not the case at all. I don't know of any evidence that shows that he scraped four or five cars. The only evidence I know on the record is that he scraped the one car of the woman whose deposition was taken. And I will go back to really just end with what I said earlier. You have a material question of fact in this case that for some reason Judge Weisslein chose to ignore, and a jury needs to hear that because it is unreasonable under any standard to shoot someone who's stopped. If the testimony is believed by the jury that he did stop, under the specific facts of this case for reckless driving, which did rise to the level of shooting him on the road, as the Honor pointed out, there is no reason whatsoever to shoot him three times in the chest. Thank you. Okay, Judge Howe, you will stand submitted. We are adjourned, and our Alaska calendar is open.
judges: Kozinski, Berzon, Tallman